UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

HENKELS & MCCOY GROUP, INC. and
HENKELS & McCOY, INC.,

                Plaintiffs,

                No. 21-CV-9576

v.

VERIZON SOURCING, LLC,

                Defendant.

------------------------------------------------------------x

**MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S PARTIAL MOTION TO DISMISS**

McMahon, J.:

Henkels & McCoy Group, Inc. and Henkels & McCoy, Inc. (together, "Plaintiffs" or "H&M") bring this action against Defendant Verizon Sourcing LLC ("Verizon"), asserting claims for Breach of Contract (Count I), Account Stated (Count II), Breach of Duty of Good Faith and Fair Dealing (Count III), Unjust Enrichment (Count IV), and Violation of New York's Prompt Payment Act ("NYPPA"), N.Y. Gen. Bus. Law § 756, *et seq.* (Count V). Plaintiffs' claims arise from an agreement between Plaintiffs and Verizon under which Plaintiffs were to design and construct fiberoptic network infrastructure projects in Portland, Detroit, and San Diego (the "Projects"). Plaintiffs allege that Verizon changed the scope of work during the period of the agreement, which resulted in increased costs and time impacts to H&M and that Verizon has unjustifiably, intentionally, and in bad faith failed to compensate Plaintiffs for these costs.

1

Defendant moves to dismiss Counts III, IV, and V and Plaintiffs' claim for punitive damages. (Dkt. No. 22). The motion is opposed. (Dkt. No. 26).

For the reasons that follow, Defendant's partial motion to dismiss is DENIED in part, GRANTED in part.

## BACKGROUND

### A. Parties

Plaintiffs H&M are together a Pennsylvania-based utility construction and design company that builds infrastructure for U.S. communications providers. (Dkt. No. 1 ("Compl."), ¶¶1, 7).

Defendant Verizon is a Delaware limited liability company and a U.S. communications provider that has established a "Fiber One Initiative" to develop and create a network to support cellular and enterprise growth in the U.S. (*Id.* ¶¶2, 8).

### B. The Parties' Contract

On or about November 16, 2016, Plaintiff entered into an agreement with Verizon to design and construct infrastructure for Verizon's Fiber One Initiative (the "Agreement"). (Compl. ¶3). The cities where such services were to be performed and the scope of services for each city were defined by amendments to the Agreement. (*Id.*).

Between March and May 2017, the parties executed three amendments, pursuant to which H&M contracted to provide its services to Verizon in Portland, Oregon ("Amendment 1"), Detroit, Michigan ("Amendment 2"), and San Diego, California ("Amendment 3"). (*Id.* ¶¶12-14). Collectively, these projects are referred to as the "Projects."

In October 2017, H&M and Verizon entered into Amendment No. 6 to the Agreement ("Amendment 6"), which altered the "change order" process under the Agreement and Amendments. (*Id.* ¶18). The new "change order" process specified that, within 10 days of H&M's

receiving a change order for a project, H&M had to give Verizon a comprehensive summary of the effects of the change order, including any financial or scheduling impacts, such as whether the change order requires additional, substituted, or subtracted work and any fair valuation for the financial impact (a "Change Order Submission"). (*Id.* ¶19). Verizon was to then make a final determination of the change order impact and amount payable to H&M based on the Change Order Submission. (*Id.* ¶20).

### C. Verizon Makes Changes to H&M's Scope of Work on the Projects

In connection with each project, Verizon issued a request for proposal ("RFP") and H&M submitted a bid. (Compl. ¶21). In preparing a bid, H&M reviewed the RFP's details, including project duration, project footage, and ratio of aerial to underground construction type and established a "unit price" for its work. (*Id.* ¶22). H&M established the "unit price" by averaging the cost to perform the work within the scope of the project. (*Id.*).

After the bid was accepted, and throughout the course of the Projects, Plaintiffs allege that Verizon modified the scope of each project by (i) adding scope, (ii) deleting scope, (iii) changing scope due to Verizon's inability to obtain franchise and right-of-way agreements, and (iv) changing the electronic formatting platforms to transmit data and designs to Verizon. (*Id.* ¶23). Plaintiffs claim they suffered "significant financial and scheduling impacts" and incurred significant additional costs as a result of these various changes. (*Id.* ¶¶24-25).

### D. H&M Submits Change Order Submissions to Verizon

Facing increased costs related to Verizon's project scope modifications, H&M submitted Change Order Submissions to Verizon in connection with each of the Projects. (*Id.* ¶26).

In connection with the Portland Project, H&M submitted a Change Order Submission in the amount of $10,143,674.67. (*Id.* ¶35). Instead of making a final determination, Verizon

3

repeatedly requested additional information and clarification and delayed approval and payment on the Change Order Submission. (*Id.* ¶¶36-38). Plaintiffs alleged that the delay of approval and payment was done "intentionally, willfully and in bad faith;" that Verizon "assur[ed] H&M that it would be paid for its Change Order Submissions" so that H&M would "dutifully and diligently continue[] to carry out the changed work on the Project;" and that Verizon had "no intention of ever compensating H&M . . ." and in fact still has not compensated Plaintiffs. (*Id.* ¶¶38, 81). As of the date of the complaint, Plaintiffs allege $10,143,674.67 remains due and owing to H&M on the Portland Project. (*Id.* ¶39).

In connection with the Detroit Project, H&M filed a Change Order Submission and Verizon agreed to compensate H&M in the sum of $19,545,473.43 based on the Change Order Submission. (*Id.* ¶¶17, 52). On September 21, 2021, the parties entered into a "Final Descope Cost Agreement" ("FDCA") memorializing Verizon's commitment to pay those costs. Plaintiffs allege that to date Verizon has paid only $11,082,710.60 of the amount it agreed to pay. (*Id.* ¶54). Again, Plaintiffs allege that the delay in payment was intentional and done in bad faith; that Verizon "assur[ed] H&M that it would be paid for its Change Order Submissions" so that H&M would "dutifully and diligently continue[] to carry out the changed work on the Project;" and that Verizon had "no intention of ever compensating H&M . . ." and in fact still has not compensated Plaintiffs. (*Id.* ¶91). As of the date of the complaint, Plaintiffs allege $8,462,762.80 remains due and owing to H&M on the Detroit Project. (*Id.* ¶55).

In connection with the San Diego Project, Plaintiffs claim they submitted multiple responses to various Verizon change orders, all of which remain unresolved. (*Id.* ¶42). However, Verizon repeatedly requested additional information and clarification and delayed approval and payment on the Change Order Submissions. (*Id.* ¶47). Plaintiffs eventually submitted a consolidated response totaling the lump sum impact of the change orders in the amount of

4

$25,651,911.49. (*Id.* ¶45). Plaintiffs allege, as with the other projects, that the delay in payment was intentional and done in bad faith and that Verizon representatives assured Plaintiffs of payment in order to keep Plaintiffs working on the Project without any intent of actually paying Plaintiffs for the additional costs. (*Id.* ¶¶48, 86). Plaintiffs allege that Defendant failed to approve or make payment for these costs and as of the date of the complaint, $25,651,911.49 remains due and owing on the San Diego Project. (*Id.* ¶49).

Plaintiffs filed this lawsuit on November 18, 2021.

## STANDARD

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To achieve "facial plausibility," a claim must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). To survive a motion to dismiss, the plaintiff must allege facts that "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Further, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679 (internal citations omitted).

## DISCUSSION

### I. Defendant's Motion to Dismiss Count III for Breach of the Duty of Good Faith and Fair Dealing is Denied.

The covenant of good faith and fair dealing is implied in every New York contract. *See Tractebel Energy Mktg. v. AEP Power Mktg.,* 487 F.3d 89, 98 (2d Cir. 2007) (citing *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995)). "The covenant 'embraces a pledge that neither

5

party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Dalton*, 87 N.Y.2d at 389).

"[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.* (citation and quotation omitted).

Defendant argues that the claim should be dismissed as duplicative because there exists a valid and enforceable contract governing the claims at issue. (Br. at 5). Plaintiffs counter in opposition that their good faith claim is separate and distinct from their breach of contract claim. Specifically, Plaintiffs argue that the breach of contract claim "sets forth that H&M performed its obligations pursuant to the Agreement and that Verizon failed to pay H&M for its services" whereas the claim for breach of the duty of good faith and fair dealing sets forth that Verizon "negotiated agreements to compensate H&M for its increased costs then willfully, intentionally and in bad faith delayed finalizing those agreements" and "these delays were caused by Verizon intentionally so that H&M would continue to work on the Projects on the assurances it would be paid, even though Verizon had no intention of compensating H&M for its costs." (Opp. at 5-6). Plaintiffs point out that they have plead damages for this claim "separate and distinct from H&M's breach of contract damages." (*Id.*).

The Court agrees that it is premature to dismiss this claim at this early stage of litigation. Plaintiff is entitled to plead multiple theories of recovery; Verizon can rest assured that H&M will not be allowed double recovery.

Defendants' motion to dismiss Count III is denied.

**II. Defendant's Motion to Dismiss Count IV for Unjust Enrichment is Denied as Moot.**

Under New York law, unjust enrichment "is an equitable claim that is unavailable where an adequate remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (summary order); *see also Samiento v. World Yacht Inc.*, 10 N.Y.

6

3d 70, 81 (2008). "Courts in the Second Circuit have recognized that 'an unjust enrichment claim cannot survive where it simply duplicates, or replaces, a conventional contract or tort claim.'" *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015) (quoting *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014). If a valid contract governs the subject matter of a plaintiff's claims, the plaintiff may not recover in equity, and it is appropriate to dismiss the unjust enrichment claim. *See Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 485 (E.D.N.Y. 2011).

Defendant moves to dismiss Plaintiffs' claim for unjust enrichment. (Br. at 7). In opposition, Plaintiffs submit that "H&M contacted counsel for Verizon and was advised that Verizon does not dispute that the claims outlined in the Complaint are covered by the Agreement." (Opp. at 9). Accordingly, Plaintiffs agree to "withdraw this cause of action without prejudice." (*Id.*). Defendant responds that the claim should be dismissed *with* prejudice. (Reply, at 8).

The Court was prepared to deny Defendant's motion to dismiss Count IV as adequately pled as an alternative theory of recovery. However, in light of Plaintiffs' withdrawal of Count IV, the Court will simply deny the motion to dismiss Count IV as moot. Plaintiff's withdrawal is without prejudice.

### III. Defendant's Motion to Dismiss Count V for Violation of New York's Prompt Payment Act is Granted.

The NYPPA was enacted "to expedite payment of all monies owed to those who perform contracting services pursuant to construction contracts." N.Y. Gen. Bus. Law § 756-a. The NYPPA "mandates a particular procedure for the submission and payment of . . . invoices" under construction contracts and "provides several remedies for noncompliance." *Maple Drake Austell Owner, LLC v. D.F. Pray, Inc.*, 385 F.Supp.3d 373, 374 (S.D.N.Y. 2019).

Defendant argues that this claim should be dismissed on two grounds: (1) the NYPPA is intended to only apply to construction projects and services performed within New York and thus is

7

inapplicable to any of the Projects at issue in this dispute; and (2) Plaintiffs fail to plead that they complied with the NYPPA's requirements to submit invoices in order to trigger any prompt payment obligation on Verizon's part. (Br. 9-10).

For the first of these, Defendant argue that the legislature expressly intended that the NYPPA reach only "construction services *in this state*" – not construction services in Oregon, Michigan, and California. (Reply 5; Br. 9) (emphasis in original). Defendant relies on a single case from the Supreme Court, New York County, where the court dismissed NYPPA claims related to construction projects for the installation of solar energy panels in New Jersey and Connecticut. The court noted that the parties had failed to identify any "authority for the notion that New York Prompt Payment Act claim may be maintained for construction services that took place outside the state" and noted that the "statutory intent of the New York Prompt Payment Act clearly suggests otherwise." *DG Project Const. Co., LLC v. Amps Elec., Inc.*, No. 595780/2020, 2021 WL 4239229, at *4 (Sup. Ct., N.Y. Cnty. Sep. 17, 2021). The court (Borrok, J.) pointed to the language in the 2002 Session Law for support that the legislature's "intent [was] to provide prompt, timely payment for companies providing 'construction services in this state' and encourage contractors/suppliers to do business 'in this state.'" *Id.*

The Court agrees with Justice Borrok that the NYPPA was intended to apply only to construction contracts and projects in New York. "'The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the Legislature . . .'" (Opp. 7 (quoting *People v. Brown*, 25 N.Y.3d 247, 250 (2015)). Here, the Session Law specifically reads: "Section 1. Legislative intent. The legislature finds that firms and organizations that provide construction services *in this state* expect and deserve to be paid in a prompt and timely manner." *See* 2002 N.Y. ALS 127, 2002 N.Y. LAWS 127, 2002 N.Y. S.N. 7724 (emphasis added); *see also* NY CLS Gen. Bus., Art. 35-E; GBL § 756-a (2002 Sess. Law News of N.Y., ch. 127, § 1, eff. Jan. 14, 2003). There is no ambiguity that the PPA was meant to apply to construction services in New York state. Here, none of the projects

occurred in New York state. There quite simply is no reason that the statute meant to apply to "construction services in this state" should be applied to construction services in other states.

Plaintiffs counter that the language of the law does not limit its reach to New York projects and points out that one New York court has "considered a claim under the NYPPA for work that was performed in Connecticut." (Opp. 8 (citing *Donninger Const., Inc. v. C.W. Brown, Inc.*, 113 A.D.3d 724 (2d Dept. 2014)). However, in *Donninger Const., Inc.*, the NYPPA claim facing the Second Department arose out of a construction contract where that contract "was negotiated and entered into in New York" and where "both parties are New York corporations, their course of dealing was established in New York . . . and the parties' principals, who also testified at trial, were New York domiciliaries." *Id.* at 723. While the Second Department acknowledged that "the work was located in Stamford, Connecticut," (which, I note, is located in the New York City Metropolitan Area, just a few miles from the New York/Connecticut border), it concluded that New York's NYPPA could be applied. *Id.*

The same cannot be said of this case. Here, none of the parties is a New York domiciliary; none of the contracts is alleged to have been negotiated in this state; and there is no course of dealing in this state. All the work was performed out of state – in Portland, Oregon; Detroit, Michigan; and San Diego, California. None of those cities is anywhere close to New York. In fact, the only reason this lawsuit is in a New York court is that the parties specified New York as their chosen litigation venue.

In the circumstances, no claim lies under the NYPPA, and Defendant's motion to dismiss Count V is granted.

## IV. Defendant's Motion to Dismiss Plaintiffs' Claim for Punitive Damages is Denied.

In general, "the question of whether to award punitive damages is 'an intensely factual,' and is ill suited for dismissal" at an "early in the litigation." *Senior Health Insurance Company of*

9

*Pennsylvania v. Beechwood Re Ltd.*, 345 F.Supp.3d 515, 533 (S.D.N.Y. 2018) (quoting *George v. Ford Motor Co.*, No. 03 Civ. 7643 (GEL), 2007 WL 2398806, at *5 (S.D.N.Y. Aug. 17, 2007)).

Defendant moves to dismiss Plaintiffs' claim for punitive damages associated with Counts II, III, and IV. (Br. at 11). This is a motion the Court would be prepared to deny, given the intensely factual nature of the question. However, in opposition, Plaintiffs withdraw their request for punitive damages. (Opp. at 4 n. 1). Plaintiffs do so "without prejudice" and while "reserv[ing] [their] right to seek punitive damages within this litigation, including . . . seeking leave to amend its Complaint." (*Id.*).

Defendant contends that "Plaintiff (sic) should not be permitted to withdraw its request for punitive damages now, only to attempt to seek them in the future," and the Court should dismiss the claim for punitive damages with prejudice. (Reply, at 9).

Frankly, I almost never grant motions to dismiss claims for punitive damages at the outset of a case. "Punitive damages" is not a separate cause of action – it is a form of relief – and motions to dismiss are properly directed to claims, not to forms of relief. While I very much doubt that I would charge punitive damages in what is basically a breach of contract case (in which such damages are rarely, if ever, awardable as a matter of law), I see no reason to decide that question now. If Plaintiffs decide not to pursue punitive damages, they can eventually withdraw their prayer for relief with prejudice. For today, the motion to dismiss the claim is denied.

## CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss Count III is DENIED; Defendant's motion to dismiss Count IV is DENIED as moot; Defendant's motion to dismiss Count V is GRANTED; and Defendant's motion to dismiss Plaintiffs' claims for punitive damages associated with Counts II and III is DENIED.

The Clerk of Court is respectfully directed to remove the motion at Docket Number 22 from the Court's list of open motions. This constitutes a written opinion.

Dated: April 21, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL